**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| DIANNE TURNER, LULA WILLIAMS, RENEE GALLOWAY, DARLENE GIBBS, MARKETA BASS, JOHN GLATT, GWENDOLYN BECK, ANASTASIA SHERMAN, SHEILA BURNS, STANIE HAGGINS, KEISHA HAMM, DAVID HAWKINS, SHEILA SIMMONS, FAITH THOMAS, DASHAWN HUNTER, TONEKIA SHOWELL, SONJI GRANDY, SUSIE ALLEN, KRISTA BIEHL, BEVERLY GROSS, RACHEL BULETTE, RICKY PANAS, LORNA JOHNSON, ESTHER TAITAI, AND CYNTHIA BURNS *individually and on behalf of all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> ZESTFINANCE, INC., BLUECHIP FINANCIAL d/b/a Spotloan, and DOUGLAS MERRILL, <br><br> Defendants. | Case No. 3:19-cv-00293-DJN <br><br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

COME NOW Plaintiffs Diane Turner, Lula Williams, Renee Galloway, Darlene Gibbs,

Marketa Bass, John Glatt, Gwendolyn Beck, Anastasia Sherman, Sheila Burns, Stanie Haggins,

Keisha Hamm, David Hawkins, Sheila Simmons, Faith Thomas, Dashawn Hunter, Tonekia

Showell, Sonji Grandi, Susie Allen, Krista Biehl, Beverly Gross, Rachel Bulette, Ricky Panas,

Lorna Johnson, Esther Taitai, and Cynthia Burns *on behalf of themselves and all individuals*

*similarly situated* ("Plaintiffs"), by counsel, and for their Class Action Complaint against Defendants, allege as follows:

## **GENERAL ALLEGATIONS**

1.      This is a case about a scheme to make online short-term loans (commonly called "payday loans") that carry triple-digit interest rates, often exceeding 400%, and that are illegal in many states.

2.      Payday loans often target vulnerable borrowers and, left unregulated, can economically devastate borrowers and their communities. Consumers often renew the loans or take out new loans when they are unable to pay their original loans off, creating a cycle of mounting debt.

3.      In recent years, payday lenders have concocted various schemes to make high-interest loans over the internet while avoiding state usury laws.

4.      In one scheme—the so-called "rent-a-bank" strategy—payday lenders convinced banks headquartered in states with high (or nonexistent) usury limits to form a lending venture in order to capitalize on the fact that the bank was obligated to comply only with the usury law of its home state, even for loans made elsewhere.

5.      Federal banking regulators shut down these "rent-a-bank" schemes. Michael A. Stegman, *Payday Lending*, 21 JOURNAL OF ECONOMIC PERSPECTIVES 169, 178-89 (2007) (describing rent-a-bank scheme and regulatory reaction).

6.      Some payday lenders have since developed a new method to attempt to avoid state usury laws—the "rent-a-tribe" scheme.

7.      In a rent-a-tribe scheme, the payday lender—which does most of its lending over the internet—affiliates with a Native American tribe to attempt to insulate itself from federal and

state law by piggy-backing on the tribe's sovereign legal status and its general immunity from suit under federal and state laws.

8.      Like its predecessors, this scheme is doomed to fail because even a cursory examination of the underlying relationship between the payday lender and the tribe demonstrates that the relationship is insufficient to permit the lender to avail itself of the tribe's immunity.

9.      Rent-a-tribe schemes are not designed to promote tribal business but instead are contrivances aimed at avoiding state usury law, with the vast majority of the revenues going to non-tribal entities.

10.      In recent years, these rent-a-tribe schemes have come under increasing scrutiny from regulators, with one prominent perpetrator convicted and sentenced to 16 years in prison related to federal racketeering and truth-in-lending laws.[1]

11.      This case is about such a rent-a-tribe scheme. In this case, non-tribal entities ZestFinance and Douglas Merrill provided the capital, marketing, underwriting, and other resources for BlueChip Financial dba Spotloan ("BlueChip"), a purportedly tribal entity in North Dakota that makes usurious loans to persons located throughout the United States.

12.      Plaintiffs, on behalf of themselves and the Class set forth below, seek to recover damages and penalties under state and federal law for the usurious interest and fees charged by Defendants.

---

[1] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday.

## JURISDICTION AND VENUE

13.     This Court has original jurisdiction over Plaintiffs' Racketeer Influenced and Corrupt Organizations ("RICO") claims under 18 U.S.C. § 1962, and 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

14.     This Court also has jurisdiction under the Class Action Fairness Act because Plaintiffs are citizens of Virginia, Florida, Georgia, Illinois, Maryland, New Jersey, California, Washington, Connecticut, and Texas, at least one Defendant is not a citizen of any of those states, the matter in controversy exceeds $5,000,000, and there are at least 100 members of each Class.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in Virginia, including in this District and Division. Additionally, venue is proper in this Court pursuant to 18 U.S.C. § 1965(a) because Defendants transacted their affairs in this District and Division.

## THE PARTIES

16.     Plaintiff Dianne Turner is a natural person and resident of Roanoke, Virginia.

17.     Plaintiff Lula Williams is a natural person and resident of this Division.

18.     Plaintiff Renee Galloway is a natural person and resident of this Division.

19.     Plaintiff Darlene Gibbs is a natural person and a resident of this Division.

20.     Plaintiff Marketa Bass is a natural person and resident of Danville, Virginia.

21.     Plaintiff John Glatt is a natural person and resident of this Division.

22.     Plaintiff Anastasia Sherman is a natural person and a resident of Tampa, Florida.

23.     Plaintiff Sheila Burns is a natural person and a resident of Macon, Georgia.

24.     Plaintiff Stanie Haggins is a natural person and a resident of Decatur, Georgia.

25.     Plaintiff Keisha Hamm is a natural person and a resident of Conyers, Georgia.

26.     Plaintiff David Hawkins is a natural person and a resident of Lithonia, Georgia.

27.     Plaintiff Sheila Simmons is a natural person and a resident of Albany, Georgia.

28.     Plaintiff Faith Thomas is a natural person and a resident of Snellville, Georgia.

29.     Plaintiff Dashawn Hunter is a natural person and a resident of Homewood, Illinois.

30.     Plaintiff Tonekia Showell is a natural person and a resident of Seaford, Maryland.

31.     Plaintiff Sonji Grandy is a natural person and a resident of Bayonne, New Jersey.

32.     Plaintiff Susie Allen is a natural person and a resident of Dallas, Texas.

33.     Plaintiff Gwendolyn Beck is a natural person and a resident of Houston, Texas.

34.     Plaintiff Krista Biehl is a natural person and a resident of Connecticut.

35.     Plaintiff Beverly Gross is a natural person and a resident of Connecticut.

36.     Plaintiff Lorna Johnson is a natural person and a resident of Washington.

37.     Plaintiff Ricky Panas is a natural person and a resident of Washington.

38.     Plaintiff Rachel Bulette is a natural person and a resident of California.

39.     Plaintiff Cynthia Burns is a natural person and a resident of California.

40.     Plaintiff  Esther Taitai is a natural person and a resident of California.

41.     Defendant Douglas Merrill is a natural person residing in California.

42.     Defendant ZestFinance, Inc. is a Delaware corporation headquartered in Los Angeles, California.

43.     Defendant BlueChip Financial dba Spotloan is a purportedly tribal corporation located in Belcourt, North Dakota, and incorporated under the laws of the Turtle Mountain Band of Chippewa Indians.

## STATE USURY AND CONSUMER PROTECTION LAWS[2]

**A.    Virginia**

44.    Virginia's "usury laws serve a beneficial public purpose and are to be liberally construed with a view to advance the remedy and suppress the mischief." *Radford v. Cmty. Mortg. & Inv. Corp.*, 226 Va. 596, 601 (1984). The Supreme Court of Virginia has repeatedly acknowledged that Virginia's "usury statutes represent a clarification of the public policy of the state that usury is not to be tolerated, and the court should therefore be chary in permitting this policy to be thwarted." *Id*. at 601-02 (quoting *Heubusch & Reynolds v. Boone*, 213 Va. 414 (1972)).

45.    In accordance with this longstanding public policy, Virginia's Consumer Finance Act prohibits a person from charging an annual percentage rate ("APR") exceeding 12% without first obtaining a consumer finance license from the Commonwealth. Va. Code §§ 6.2-1501(A), 6.2-303(A). The consumer finance licensing requirements are designed to protect Virginia consumers from predatory lenders like Defendants.

46.    The Virginia General Assembly has expressly declared that any attempt to circumvent usury laws is "against public policy and void." Va. Code. § 6.2-306(A) ("Any agreement or contract in which the borrower waives the benefits of this chapter or releases any rights he may have acquired under this chapter shall be deemed to be against public policy and void."). This includes attempts to evade the application "by any device, subterfuge, or pretense

---

[2] Usury laws are not unique to the United States of America. Indeed, about "a dozen Biblical passages suggest that usurious lending, especially to the poor, is a grave sin."  Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for Candid Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 n.9 (2012). Echoing these sentiments, Pope Francis recently explained that "Usury is a serious sin: it kills life, tramples on the dignity of people, is a vehicle for corruption and hampers the common good. It also weakens the social and economic foundations of a country."  Pope Francis, Address to National Anti-Usury Council (Feb. 3, 2018), available at https://zenit.org/articles/pope-francis-usury-humiliates-and-kills.

whatsoever," including "procurement of a loan through any use or activity of a third person, whether real or fictitious." Va. Code. § 6.2-1541(C).

47. Any loan made in violation of Virginia's usury laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made." Va. Code § 6.2-1541(A)-(B).

48. Defendants were never licensed to make consumer loans in Virginia.

**B.     Texas**

49. Subject to limited exceptions, the maximum rate of interest allowed in Texas is 10%. Tex. Fin. Code § 302.001.

50. Texas law requires persons issuing consumer loans to obtain a license. Tex. Fin. Code § 342.051. Under certain conditions, licensees may exceed the 10% maximum interest rate for consumer loans not secured by real property, depending on the type of loan and subject to calculations made by the Consumer Credit Commissioner. *Id.* § 342.201.

51. Creditors who charge more than 10% in interest in violation of Texas's Finance Code are liable for the greater of (1) three times the amount of interest charged in excess of 10%, or (2) the lesser of $2,000 or 20 percent of the principal. Tex. Fin. Code § 305.001.

52. Additionally, if the interest charged and received is more than twice the permissible amount, the creditor will be held liable for the principal amount, the interest, and any other charges or fees. Tex. Fin. Code § 305.002.

53. Defendants were never licensed to make loans to Texas consumers.

**C.     Florida**

54. In Florida, the maximum allowable rate of interest on loans of $500,000 or less is eighteen percent (18%). Fla. Stat. § 687.03.

55.    Florida makes it either a misdemeanor or felony—depending on the interest rate—to charge usurious interest in excess of twenty-five percent (25%). Fla. Stat. § 687.071. Loan contracts in excess of the 25% threshold triggering criminal liability for usury are "therefore void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

56.    Lenders must be licensed by the Office of Financial Regulation, and loans of $25,000 or less with interest exceeding 18% per annum are void and unenforceable. Fla. Stat. § 516.02(1-2).

57.    Under Florida law, consumers can recover twice the amount of usurious interest paid on illegal loans. Fla. Stat. § 687.04.

58.    Defendants were never licensed to make consumer loans in Florida.

**D.    Georgia**

59.    Short term loans of $3,000 or less fall within the scope of the Georgia Industrial Loan Act. Ga. Code Ann. §§ 7-3-1, *et seq*.

60.    The purpose of the Industrial Loan Act is to "to define and prevent usury." *Georgia Cash Am., Inc. v. Greene*, 734 S.E. 2d 67, 71 (2012) (citation omitted).

61.    "The wording and legislative history of the ILA make clear that the [Industrial Loan] Act is to be read liberally and broadly to prevent even the most subtle or indirect methods of assessing usurious rates." *Williams v. Public Finance Corp.*, 598 F.2d 349, 353 n.6 (5th Cir. 1979).

62.    Unless expressly exempted by the terms of the Industrial Loan Act, a lender must obtain a license by the Industrial Loan Commissioner to make loans of $3,000 or less at an interest rate exceeding eight percent (8%). Ga. Code Ann. §§ 7-3-5, 7-3-6, 7-3-8.

63.     Pursuant to Ga. Code Ann. § 7-3-29(a), "[a]ny person who shall make loans under [the Industrial Loan Act] without first obtaining a license . . . shall be guilty of a misdemeanor; and any contract made under [the Industrial Loan Act] by such person shall be null and void."

64.     Georgia's Payday Lending Act also prohibits lenders from making loans of $3,000 or less at an interest rate that exceeds eight percent (8%) unless licensed to make such loans under the Industrial Loan Act or other laws regulating financial institutions. Ga. Code Ann. §§ 16-17-1, *et seq*.

65.     A lender who violates of the Payday Lending Act "shall be guilty of a misdemeanor of a high and aggravated nature and upon conviction thereof shall be punished by imprisonment for not more than one year or by a fine not to exceed $5,000.00 or both." Ga. Code Ann. § 16-17-2(d).

66.     Ga. Code § 16-17-3 bars a lender from collecting any indebtedness created by the illegal loan and declares the loan "void ab initio."

67.     Defendants were never licensed to make consumer loans in Georgia.

68.     Under Georgia's RICO statute, it is "unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." Ga. Code Ann. § 16–14–4(a).

69.     Violations of Georgia's Payday Lending Act, Ga. Code Ann. §§ 16-17- 1, *et seq* are predicate acts and racketeering activity, reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs. Defendants have engaged in a pattern of racketeering activity by their violation of Georgia's Payday Lending Act.

70.     Conspiracy and/or endeavoring to violate the substantive provisions of Georgia's RICO Act is a separate violation of the statute. Ga. Code Ann. § 16-14–4(c).

**E.     Illinois**

71.     Under the Illinois Consumer Installment Loan Act, a "'[s]mall consumer loan'" means a loan upon which interest is charged at an annual percentage rate exceeding 36% and with an amount financed of $4,000 or less. 205 ILCS 670/15.

72.     Small consumer loan lenders are required to be licensed to make loans. 205 ILCS 670/1. A licensed lender may charge interest rates up to 99%. *See* 205 ILCS 670/17.2(a)(1), (b)(3)).

73.     In a lender is unlicensed, annual interest is capped at 9%: "[I]n all written contracts it shall be lawful for the parties to stipulate or agree [to] 9% per annum, or any less sum of interest." *See* 815 ILCS 205/4(1).

74.     If an unlicensed lender makes a small consumer loan to an Illinois consumer, "the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan." 205 ILCS 670/20(d).

75.     Defendants have never been licensed to make small consumer loans in Illinois.

76.     Through a civil action, a borrower can sue a lender for violating the Illinois Consumer Installment Loan Act "prior to the expiration of 2 years after the date of his last scheduled payment" to reduce the balance by the amount that the lender is entitled to recover, and to recover attorneys' fees and costs. 205 ILCS 670/20(b); 205 ILCS 670/20.7

77.     The Illinois Consumer Fraud Act also provides a remedy for consumers who are the victim of unfair or deceptive acts or practices in trade or commerce. 815 ILCS 505/2; 815 ILCS 550/10a.

**F.    Maryland**

78.    Maryland law prohibits lenders from making consumer loans to Maryland residents in excess of 24% or 33% depending on the size of the loan. Md. Code, Com. Law § 12-306.

79.    Moreover, no person may make a loan under Maryland's Consumer Loan Law without being licensed by the Maryland Commissioner of Financial Regulation. Md. Code, Com. Law § 12-302; Md. Code, Fin. Inst. § 11-204. Md. Code, Com. Law § 12-314 provides that a person "who is neither a licensee nor exempt from licensing may not receive or retain any principal, interest, or other compensation with respect to any loan that is unenforceable under this subsection."

80.    Defendants have never been licensed to make loans in Maryland.

81.    Because Defendants violated Maryland's licensing and interest rate requirements, it was unlawful for any person, including Defendants, to collect or receive any interest, fees, or charges on the loans. Md. Code, Com. Law § 12-314.

82.    For willful violations, like those committed here, Maryland law allows consumers to recover principal, interest, or other compensation paid to Defendants with respect to all illegal loans. Md. Code, Com. Law § 12-313.

**G.    New Jersey**

83.    The maximum interest rate chargeable to consumers under New Jersey law is 16%. N.J. Stat. § 31:1-1(a). Charging consumers a rate of interest greater than 30% is a criminal act under New Jersey law. N.J. Stat. § 2C:21-19.

84.    The New Jersey Consumer Finance Licensing Act ("CFLA") governs the provision of installment loans to consumer in New Jersey and allows licensed lenders to charge interest higher than 16% for installment loans under $50,000. N.J. Stat. §§ 17:11C-1 to 17:11C-49

85.     The CFLA provides that anyone engaged in business as a consumer lender who is
not licensed is "guilty of a crime of the fourth degree." N.J. Stat. § 17:11C-33(b). The act further
provides that loans made by unlicensed lenders "shall be void and the lender shall have no right to
collect or receive any principal, interest or charges unless the act was the result of a good faith
error...." *Id.*

86.     Defendants were never licensed to make consumer loans in New Jersey.

87.     The New Jersey Consumer Fraud Act also provides a remedy for consumers who
are the victim of unfair or deceptive acts or practices in trade or commerce. N.J. Stat. § 56:8-2.

**H.   California**

88.     Recognizing that "[u]sury—the charging of excessive interest rates—is an ancient
concept dating back to the earliest commercial civilizations," California, which was founded in
1850, has regulated maximum interest rates since 1872. Robert R. Rickett, California's Model
Approach to Usury, 18 Stan. L. Rev. 1381 (1966).

89.     Currently, the law of usury in California is based upon California Constitution
article XV, section 1, which limits the interest payable "[f]or any loan or forbearance of any
money."  Sw. Concrete Products v. Gosh Constr. Corp., 798 P.2d 1247, 1249 (Cal. 1990) (quoting
Cal. Const. Art. XV § 1).

90.     Under the California Constitution, "unless a lender falls into one of the exemptions
approved by the state legislature, it may not charge more than 10% interest per annum on a loan."
Dev. Acquisition Group, LLC v. EA Consulting, Inc., 776 F. Supp. 2d 1161, 1164 (E.D. Cal. 2011)
(citing Cal. Const. Art. XV § 1).

91.     "An interest rate in excess of 10% is usurious, and if a lender negotiates a loan at a
usurious rate absent a qualified exemption, the agreement shall be void and the lender will have
no action at law to recover any interest."  Id.

92.     California's usury laws "are primarily designed to penalize those who take advantage of 'unwary and necessitous borrowers.'"  See id. at 1166 (quoting Fox v. Peck Iron and Metal Co., Inc., 25 B.R. 674, 692-93 (Bankr. S.D. Cal. 1982)).

93.     Thus, California law allows borrowers to recover all interest paid on the loans in excess of 10% within the past two years, plus treble damages for any interest paid within the year preceding the filing of this action and their attorney's fees and costs. Cal. Civ. Code § 1916-3; Dev. Acquisition Group, 776 F. Supp. 2d at 1165; Rickett, supra, at 1391.

94.     Lending at usurious interest rates also constitutes a violation of California's unfair competition laws, Cal. Bus. & Prof.. Code § 17200, et seq., which prohibits unlawful, unfair, or deceptive business practices. Cal. Bus. & Prof. Code § 17200.

95.     Defendants have never been licensed to lend in California.

### I.     Connecticut

96.     Without obtaining "a small loan license" from the Commissioner of Connecticut's Department of Banking, "no person shall, by any method, including but not limited to, mail, telephone, Internet or other electronic means" make "a small loan to a Connecticut borrower," "[o]ffer, solicit, broker, directly or indirectly arrange, place or find a small loan for a prospective Connecticut borrower," or "[r]eceive payments of principal and interest in connection with a small loan made to a Connecticut borrower[.]" Conn. Gen. Stat. Ann. § 36a-556(a)(1)-(2), (4).

97.     A "small loan" is defined as "any loan of money or extension of credit" where: "(A) The amount or value is fifteen thousand dollars or less; and (B) the APR is greater than twelve percent." Conn. Gen. Stat. Ann. § 36a-555(11).

98.     If a person fails to obtain a license prior to making a small loan, "[s]uch small loan shall be void and no person shall have the right to collect or receive any principal, interest, charge or other consideration thereon." Conn. Gen. Stat. Ann. § 36a-558(d)(1).

99.    In addition, even when a person obtains a small loan license, Connecticut law prohibits the charging of an annual percentage rate ("APR") of 36% for loans under $5,000.00. Conn. Gen. Stat. Ann. § 36a-558(d)(1).

100.    Defendants were never licensed to make consumer loans in Connecticut, rendering each of the loans made to Plaintiffs and class members void.

101.    Additionally, even if they were licensed, Defendants' loans far exceed the 36% cap provided in Conn. Gen. Stat. Ann. § 36a-558(d)(1).

**J.     Washington**

102.    Washington's usury laws were "enacted in order to protect the residents of this state from debts bearing burdensome interest rates" and "in recognition of the duty to protect our citizens from oppression."  RCW 19.52.005.

103.    In Washington, the maximum allowable interest rate is twelve percent per annum. RCW 19.52.020(1); see also RCW 19.52.025; State Maximum Interest Rate, available at http://leg.wa.gov/CodeReviser/Documents/rates.htm. "No person shall directly or indirectly take or receive in money, goods, or things in action, or in any other way, any greater interest for the loan or forbearance of any money, goods, or things in action."  RCW 19.52.020(1).

104.    If interest greater than the statutory maximum of twelve percent is directly or indirectly contracted for, received, or reserved, the contract is usurious. RCW 19.52.030.

105.    If a usurious interest rate is charged, the creditor shall be entitled to collect only the principal amount of the loan, less the amount of interest accruing thereon, and if any interest was actually paid, the creditor shall be entitled to collect only the principal amount less twice the amount of the interest paid and less the amount of all accrued by unpaid interest. RCW 19.52.030. A plaintiff may seek application of these statutory penalties by bringing an action under RCW 19.52.032.

106.    RCW Chapter 19.52 applies to loans made to any person residing in Washington at the time the loan was made, regardless of the location where the loan was made. RCW 19.52.034.

107.    In addition to a statutory usury claim entitling a plaintiff to recover the penalties provided in RCW 19.52.030, entering into or transacting a usurious contract constitutes a per se unfair act or practice in the conduct of commerce for purposes of establishing a claim under the Washington Consumer Protection Act. RCW 19.52.036.

108.    Defendants were never licensed to lend in Washington.


**DEFENDANTS' SCHEME TO AVOID USURY LAWS**

109.    Defendants operate a rent-a-tribe scheme that charges up to 490% annual interest on short term loans. *See* www.spotloan.com/how-spot-loans-work.

110.    In 2009, former Google Chief Information Officer Douglas Merrill founded ZestFinance, which was then known as ZestCash, and which is now known as Spotloan.

111.    ZestFinance wanted to "reinvent[] the process of giving loans" and "to apply Google-like math to reinvent how credit decisions are made." *See* www.zestfinance.com/our-team.

112.    ZestCash, using its proprietary underwriting software, began making high-interest loans over the internet.

113.    By mid-2012, ZestCash was rebranded as "Spotloan."

114.    In an effort to avoid state usury laws, in 2012, Merrill and ZestFinance affiliated with the Turtle Mountain Band of Chippewa Indians (the "Tribe") located in Belcourt, North Dakota.

115.    At the direction of Merrill and ZestFinance, a tribal entity, BlueChip Financial, was created to serve as a front to disguise ZestFinance and Merrill's role in making usurious loans.

116.    BlueChip immediately began making loans using the "Spotloan" tradename.

117.    Under the scheme, loans are made in the name of "Spotloan c/o BlueChip Financial," but ZestFinance and Merrill provide the infrastructure to market, fund, underwrite, and collect on the loans, including the underwriting software.

118.    ZestFinance and Merrill have received significant financing from Victory Park Capital Advisors, a hedge fund that has funded other rent-a-tribe payday lending schemes.[3]

119.    The primary lending and collection operations of BlueChip are not operated on tribal land or on tribal property. For example, payments on the loans are not made to BlueChip on tribal lands, but instead are sent to a PO Box located in Palatine, Illinois. Further, BlueChip's CEO works in San Diego, California.

120.    The Tribe has little or no control over how the loans are financed or underwritten. ZestFinance provides all of the underwriting services for the loans.

121.    The Tribe receives only about 1% of the profits from the lending activities while 99% of the profits go to ZestFinance and other non-tribal entities.

122.    Despite not being operated or controlled by the Tribe, Defendants purport to represent to consumers that state laws designed to protect consumers from usurious loans do not apply to their loans from Defendants. For example, Defendants' form loan agreements state that: "By signing this Loan Agreement, you agree that the laws of the Tribe will apply to the Loan Agreement, and understand that United States state law does not apply to the Loan Agreement in any way."

123.    This scheme has been very successful. Defendants have made over 500,000 loans since 2012.

---

[3]    *See*    www.foxbusiness.com/features/think-finance-bankruptcy-exposes-fallout-with-victory-park-capital.

124.    In 2016, BlueChip was ordered to cease and desist from lending in Illinois by the Illinois Department of Financial and Professional Regulation for not having a license to lend in Illinois.[4]   The states of Washington and Connecticut have also taken actions against the lending scheme.

## PLAINTIFFS' EXPERIENCES

**K.    Plaintiff Dianne Turner (Virginia)**

125.    On or around November 13, 2015, while living in Virginia, Plaintiff Dianne Turner took out her Spotloan.

126.    The principal amount on the loan was $400, and the interest rate was over 360%.

127.    Plaintiff Dianne Turner repaid $264.76 on the loan—the majority of which was credited to interest and fees.

128.    As part of her loan application, Plaintiff Turner provided her Virginia address.

**L.    Plaintiff Lula Williams (Virginia)**

129.    On or around September 23, 2013, while living in Virginia, Plaintiff Williams took out her first Spotloan.

130.    The principal amount on the loan was $500, and, upon information and belief, the interest rate was over 165%.

131.    Plaintiff Williams paid off the loan in a series of eight payments, totaling more than $1,200.

132.    On or around April 11, 2014, while living in Virginia, Plaintiff Williams took out her second Spotloan.

---

[4] *See* www.idfpr.com/DFI/CCD/Discipline/BluechipFinancialCDOrder.pdf.

133.    Plaintiff Williams repaid $96.40 on the loan—the majority of which was credited to interest and fees.

134.    As part of her loan applications, Plaintiff Williams provided her Virginia address.

**M.   Plaintiff Marketa Bass (Virginia)**

135.    On or around January 18, 2017, while living in Virginia, Plaintiff Bass took out her first Spotloan.

136.    The principal amount on the loan was $700, and the interest rate was 460%.

137.    Plaintiff Bass paid off the loan within a few weeks, paying a total amount of $823.51.

138.    While living in Virginia, Plaintiff Bass took out four additional loans with Spotloan, repaying at least $1,660 on these illegal loans.

139.    As part of her loan applications, Plaintiff Bass provided her Virginia address.

**N.   Plaintiff Renee Galloway (Virginia)**

140.    On or around June 15, 2017, while living in Virginia, Plaintiff Galloway took out her Spotloan.

141.    The principal amount on the loan was $800, and the interest rate was over 460%.

142.    Plaintiff Galloway repaid $436.71 on the loan—the majority of which was credited to interest and fees.

143.    As part of her loan application, Plaintiff Galloway provided her Virginia address.

**O.   Plaintiff Darlene Gibbs (Virginia)**

144.    On or around March 29, 2016, while living in Virginia, Plaintiff Gibbs took out her Spotloan.

145.    The principal amount on the loan was $800, and the interest rate was over 450%.

146.     Plaintiff Gibbs repaid approximately $240.00 on the loan—the majority of which was credited to interest and fees.

147.     As part of her loan application, Plaintiff Gibbs provided her Virginia address.

**P.     Plaintiff John Glatt (Virginia)**

148.     On or around November 23, 2016, while living in Virginia, Plaintiff John Glatt took out his first Spotloan.

149.     The principal amount on the loan was $400, and the interest rate was over 165%. Plaintiff paid off the loan in a series of six $110.25 payments. Plaintiff Glatt paid the loan off by February 22, 2017, paying a total of $661.50.

150.     On or around March 21, 2017, while living in Virginia, Plaintiff Glatt took out his second and final Spotloan.

151.     The principal amount on the loan was $600 and the interest rate was over 200%. Plaintiff Glatt paid off the loan in a series of eight $152.48 payments. Plaintiff Glatt paid the loan off by July 21, 2017, paying a total of $1,219.84.

152.     As part of each loan application, Plaintiff Glatt provided his Virginia address.

**Q.     Plaintiff Anastasia Sherman (Florida)**

153.     On or around May 20, 2016, while living in Florida, Plaintiff Anastasia Sherman took out her first loan with Spotloan.

154.     The principal amount on the loan was $800, and the interest rate was 450%. The loan required 16 bi-weekly payments of about $150.53, a total of approximately $2,408.48 in payments. Plaintiff Sherman paid off her loan in full on or around March 24, 2017, paying in excess of the principal balance of the loan.

155.     Plaintiff Sherman took out a second loan with Spotloan on or around March 29, 2017.

156.    The principal amount on the loan was $800, and the interest rate was 460%. Plaintiff Sherman paid off the loan in a series of payments made to both Spotloan and a collection agency. Plaintiff Sherman paid in excess of the principal amount on her loan.

157.    As part of her loan application, Plaintiff Sherman provided her Florida address.

**R.    Plaintiff Stanie Haggins (Georgia)**

158.    On or around December 7, 2016, while living in Georgia, Plaintiff Stanie Haggins took out a loan with Spotloan.

159.    The principal amount on the loan was $400, and the yearly interest rate was 490%. Plaintiff Haggins paid no less than $860.09 to Spotloan to pay back this loan, well in excess of the principal balance.

160.    As part of her loan application, Plaintiff Haggins provided her Georgia address.

**S.    Plaintiff Sheila Burns (Georgia)**

161.    In 2015, while living in Georgia, Plaintiff Sheila Burns took out her first Spotloan.

162.     The principal amount on the loan was $400. Plaintiff Burns paid back the loan, including an excessive interest rate.

163.    One or around December 15, 2017, while living in Georgia, Plaintiff Burns took out another Spotloan.

164.    The principal amount on the loan was $400. Plaintiff Burns paid back the loan, including an excessive interest rate of more than 475%, paying back a total of at least $1,980.30. Plaintiff's last Spotloan payment was made on October, 12, 2018.

165.    As part of the loan applications, Plaintiff Burns provided her Georgia address.

**T.    Plaintiff Keisha Hamm (Georgia)**

166.    From 2015 through 2018 Plaintiff Keisha Hamm took out at least five loans with Spotloan, including her Georgia address on each application. The first loan was in 2015, with an unknown principal balance, but Plaintiff Hamm paid back at least $800 on said loan.

167.    On or around March 10, 2016, while living in Georgia, Plaintiff Hamm took out another Spotloan.

168.    The principal amount on the loan was $800. Plaintiff Hamm paid back the loan with a series of $161.04 payments until the loan and an excessive interest rate was paid back to Spotloan.

169.    On or around December 7, 2016, while living in Georgia, Plaintiff Hamm took out another Spotloan.

170.    The principal amount on the loan was $800 and the interest rate was over 275%. Plaintiff paid off the loan in a series of 12 payments. Plaintiff Hamm paid the loan off by July 31, 2017, paying a total of $2,296.26.

171.    On or around August 4, 2017, while living in Georgia, Plaintiff Hamm took out another Spotloan.

172.    The principal amount on the loan was $800 and the interest rate was over 350%. Plaintiff paid off the loan in a series of 18 payments. Plaintiff Hamm paid the loan off by June 5, 2018, paying a total of $2,912.38.

173.    One or around June 5, 2018 Plaintiff Hamm took out her final Spotloan. The principal amount on the loan was $800 and Plaintiff Hamm made at least the first two payments on the loan.

174.    As part of each loan application, Plaintiff Hamm provided her Georgia address.

U.    **Plaintiff David Hawkins (Georgia)**

175.    On or around October 19, 2016, while living in Georgia, Plaintiff David Hawkins took out his first Spotloan.

176.    The principal amount on the loan was $600. Plaintiff Hawkins paid back the loan, including an interest rate of more than 275%, paying a total of at least $1,770.21.

177.    On or around December 5, 2017, while living in Georgia, Plaintiff Hawkins took out his second Spotloan.

178.    The principal amount on the loan was $600. Plaintiff Hawkins paid back the loan, including an interest rate of more than 250%, paying a total of at least $1,599.13.

179.    On or around August 1, 2018, while living in Georgia, Plaintiff Hawkins took out his third Spotloan.

180.    The principal amount on the loan was $700. Plaintiff Hawkins made the first three payments, paying back around $329.79 before revoking his authorization.

181.    As part of the loan applications, Plaintiff Hawkins provided his Georgia address.

V.    **Plaintiff Sheila Simmons (Georgia)**

182.    On or around December 18, 2017, while living in Georgia, Plaintiff Sheila Simmons took out her first and only Spotloan.

183.     The principal amount on the loan was $800. Plaintiff Simmons paid back the loan until both the loan principal and an excessive interest rate were paid back to Spotloan, paying a total of at least $1,498.16. Plaintiff stopped making loan payments on June 1, 2018.

184.    In February 2019 Plaintiff Simmons started receiving debt collection attempts via email from TrueAccord. TrueAccord cites in their emails that they would like to help Plaintiff Simmons resolve her $773.64 Spotloan balance. Throughout the months of February and March

2019 plaintiff has received multiple emails per week from TrueAccord regarding her outstanding Spotloan balance.

185.    As part of the loan application with Spotloan, Plaintiff Simmons provided her Georgia address.

**W.    Plaintiff Faith Thomas (Georgia)**

186.    On or around June 5, 2017, while living in Georgia, Plaintiff Faith Thomas took out her first Spotloan.

187.    The principal amount on the loan was $800. Plaintiff Thomas paid back the loan with a series of $149.83 bi-monthly payments until both the loan and an excessive interest rate were paid back to Spotloan.

188.    Shortly after paying back her first Spotloan, in March of 2018, Plaintiff Thomas took out her second Spotloan.

189.    The principal amount on the loan was $800. Plaintiff Thomas paid back the loan with a series of $130.33 bi-monthly payments until both the loan and an excessive interest rate were paid back to Spotloan.

190.    As part of both the loan applications, Plaintiff Thomas provided her Georgia address.

**X.    Plaintiff Dashawn Hunter (Illinois)**

191.    On or around August 30, 2017, while living in Illinois, Plaintiff Dashawn Hunter took out her first loan with Spotloan.

192.    The principal amount on the loan was $400, and the interest rate was 490%. The loan required 21 bi-weekly payments of about $80.40. Plaintiff Hunter paid off her loan in full on September 6, 2017, paying in excess of the principal balance.

193.    On or around September 13, 2017, Plaintiff Hunter took out her second loan with Spotloan.

194.    The principal amount on the loan was $600, and the yearly interest rate was 460%. The loan required 13 bi-weekly payments of about $126.44. Plaintiff Hunter paid off this loan in full.

195.    As part of her loan application, Plaintiff Hunter provided her Illinois address.

**Y.    Plaintiff Sonji Grandy (New Jersey)**

196.    On or around November 30, 2015, while living in New Jersey, Plaintiff Sonji Grandy took out her first Spotloan.

197.    The principal amount on the loan was $500, and the interest rate was over 260%. Plaintiff Grandy paid the loan off by May 19, 2016, paying a total of $1,317.90.

198.    On or around August 2, 2016, while living in New Jersey, Plaintiff took out a second loan through Spotloan.

199.    The principal amount on the loan was $600. Plaintiff deviated from the standard Spotloan payment plan. On August 19, 2016, Plaintiff Grandy made the final payment, having paid a total of $717.38 by that date.

200.    On or around October, 4 2016, while living in New Jersey, Plaintiff Grandy took out her third Spotloan.

201.    The principal amount on the loan was $600, and the interest rate was over 240%. Plaintiff Grandy paid the loan off by June 30, 2017, paying a total of $1456.16.

202.    On or around September 1, 2017, while living in New Jersey, Plaintiff Grandy took out her fourth and final Spotloan.

203.    Plaintiff made six payments of $79.53, having paid a total of $477.18 by December 1, 2017. The interest rate was more than 150%.

204.    As part of each loan application, Plaintiff Grandy provided her New Jersey address.

**Z.    Plaintiff Tonekia Showell (Maryland)**

205.    On or around November 27, 2017, while living in Maryland, Plaintiff Tonekia Showell took out a Spotloan.

206.    The principal amount on the loan was $800, and the interest rate was over 325%. Plaintiff Showell paid the loan off by September 28, 2018, paying a total of around $2,624.04.

207.    As part of the loan application, Plaintiff Showell provided her Maryland address.

**AA.    Plaintiff Susie Allen (Texas)**

208.    On or around November 17, 2017, while living in Texas, Plaintiff Susie Allen took out her first Spotloan.

209.    The principal amount on the loan was $600 and the interest rate was over 240%. Plaintiff Allen paid the loan off by June 5, 2018, paying a total of $1,480.92.

210.    On or around June 12, 2018, while living in Texas, Plaintiff Allen took out her second Spotloan.

211.    The principal amount on the loan was $500. Plaintiff Allen revoked her authorization after paying in excess of the principal amount back to Spotloan.

212.    As part of the loan applications, Plaintiff Allen provided her Texas address.

**BB.    Plaintiff Gwendolyn Beck (Texas)**

213.    On or around March 16, 2016, while living in Texas, Plaintiff Gwendolyn Beck took out a loan from Spotloan.

214.    The principal amount on the loan was $400, and the interest rate was 450%. The loan required 8 payments of about $140.68. Plaintiff Beck paid the loan off by November 1, 2016, paying a total of $1,116.23.

215.   In or around August 2017, while living in Texas, Plaintiff Beck took out a second loan from Spotloan.

216.   The principal amount on the loan was $600, and the interest rate was in excess of 450%. Plaintiff Beck settled the loan in August 2018, having paid a total of $2,884.45 by that date.

217.   As part of both loan applications, Plaintiff Beck provided her Texas address.

**CC.   Plaintiff Beverly Gross (Connecticut)**

218.   On November 7, 2017, Plaintiff Gross obtained a loan with Spotloan.

219.   The principal amount of the loan was $600, and the interest rate was 490%.

220.   Plaintiff Gross repaid the loan in accordance with its terms, *i.e.*, by repaying $1,548.17 in less than six months.

221.   At the time she took out the loan, Plaintiff Gross resided in Stamform, Connecticut.

222.   Plaintiff Gross applied for the loan over the internet from her home computer, using her home address on the application.

223.   After she applied for the loan, she received an e-mail confirming approval for the loan and signed the contract from her residence in Connecticut.

224.   The loan was deposited directly into Plaintiff Gross's bank account that she maintains in Connecticut and all payments were automatically withdrawn from the same account.

**DD.   Plaintiff Krista Biehl (Connecticut)**

225.   In the fall of 2017, Plaintiff Biehl obtained a loan with Spotloan.

226.   The principal amount of the loan was $400, and the interest rate was at least 300%.

227.   Plaintiff Biehl paid off the loan in 21 bi-weekly payments of $77 dollars, i.e., around $1,600 dollars.

228.   At the time she took out the loan, Plaintiff Biehl resided in Connecticut.

229.    Plaintiff Biehl applied for the loan over the internet from her home computer, using her home address on the application.

230.    After she applied for the loan, she received an e-mail confirming approval for the loan and signed the contract from her residence in Connecticut.

231.    The loan was deposited directly into Plaintiff Biehl's bank account that she maintains in Connecticut and all payments were automatically withdrawn from the same account.

**EE.    Plaintiff Rachel Bulette (California)**

232.    On or around June 30, 2015, while living in California, Plaintiff took out a loan through www.spotloan.com.

233.    The principal amount on the loan was $500.00, and the interest rate was approximately 390%. The loan required seventeen (17) payments of about $83.28.  Plaintiff paid off the loan on or around July 16, 2015, having paid approximately $580.14 in total.

234.    On or around September 11, 2015, while living in California, Plaintiff took out a loan through www.spotloan.com. The principal amount on the loan was $800.00, and the interest rate was approximately 360%. The loan required seventeen (17) payments of about $119.94. Plaintiff paid off the loan on or around December 17, 2015, having paid approximately $1,479.60 in total.

235.    On or around June 27, 2016, while living in California, Plaintiff took out a loan through www.spotloan.com. The principal amount on the loan was $500.00, and the interest rate was approximately 420%. The loan required seventeen (17) payments of about $89.12. Plaintiff paid off the loan on or around March 23, 2017, having paid approximately $1,515.04 in total.

236.    On or around July 18, 2017, while living in California, Plaintiff took out a loan through www.spotloan.com.  The principal amount on the loan was $800.00, and the interest rate was approximately 460%. The loan required twenty-one (21) payments of about $136.58. Plaintiff

last paid on this loan on November 30, 2017.  Plaintiff ultimately revoked her ACH authorization for further loan payments, having paid $1,229.22 towards the loan by that date.

237.    As part of each loan application, Plaintiff provided her California address.

**FF.   Plaintiff Esther Taitai (California)**

238.    On or around January 3, 2018 Plaintiff Taitai took out her first and only Spotloan. Plaintiff Taitai took out a $800 loan using her North Highlands, CA address. Plaintiff repaid approximately $2,810.34 before revoking her authorization.

**GG.   Plaintiff Cynthia Burns (California)**

239.    On or around September 2, 2017 Plaintiff Burns took out her first loan with Spotloan while living in Los Angeles, CA. Plaintiff Burns took out a total of two loans with Spotloan between September 2017 and August 2018. In total, Plaintiff borrowed $1,100 from Spotloan, and paid back approximately $2,116.30 to Spotloan.

**HH.   Plaintiff Ricky Panas (Washington)**

240.    On or around February 14, 2017 Plaintiff Panas took out his first loan with Spotloan while living in Lakewood, WA. Plaintiff took out a total of five loans with Spotloan between February 2017 and February 2018.  In total, Plaintiff borrowed $1,800 from Spotloan, and paid back approximately $3,255.47 to Spotloan.

**II.    Plaintiff Lorna Johnson (Washington)**

241.    On or around November 14, 2017 Plaintiff Johnson took out her first and only Spotloan. Plaintiff Johnson took out a $600 loan using her Neah Bay, WA address. Plaintiff repaid her loan in full, approximately $1,548.27.

## CLASS ACTION ALLEGATIONS

242.    Plaintiffs also assert claims on behalf of the proposed Class defined as follows:

> All consumers residing within the United States who executed loan agreements with BlueChip Financial from January 1, 2012 through October 31, 2018.

**A.      Numerosity**

243.     There are tens of thousands of members of the Class. Thus, the Class is so numerous that joinder of all members is impracticable.

**B.      Commonality**

244.     There are numerous common questions of law and fact common to Plaintiffs and the members of the Class. These questions include, but are not limited to, the following:

> a.      Whether Defendants violated state usury laws;
>
> b.      Whether Defendants are protected by tribal sovereign immunity;
>
> c.      Whether Defendants engaged in unfair or deceptive acts or practices;
>
> d.      Whether Defendants constitute an "enterprise" under RICO;
>
> e.      Whether Defendants violated RICO by charging interest rates more than

twice the legal limit under state law;

> f.      The proper measure and amount of damages for the Class.

**C.      Typicality**

245.     Plaintiffs' claims are typical of the claims of the Class they seek to represent. Each Plaintiff, like members of the Class, took out usurious loans from Defendants. Thus, Plaintiffs' claims, like the claims of the Class, arise out of the same common practices and conduct by Defendants and are based on the same legal and remedial theories.

**D.      Adequacy**

246.     Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have competent and capable attorneys who are experienced trial lawyers with significant experience litigating complex class actions, including experience litigating rent-a-tribe cases. Plaintiffs and

their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests that conflict with the Class.

### E. Injunctive Relief

247.  The Class meet the requirements for certification to obtain injunctive or equitable relief under Fed. R. Civ. P. 23(b)(2), as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole. Prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants.

### F. Predominance and Superiority

248.  The Class meet the requirements for certification to seek monetary relief under Fed. R. Civ. P. 23(b)(3), as the questions of law or fact common to class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Additionally, individual actions may be dispositive of the interests of members of the Class even though certain members of the Class is not parties to such actions. Further, a class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

a.  Absent a class action, as a practical matter, members of the Class will be unable to obtain redress, Defendants' violations will continue without remedy, and additional consumers will be harmed.

b.  It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions.

c.     A class action will permit an orderly and expeditious administration of class claims and foster economies of time, effort, and expense.

d.     The lawsuit presents no difficulties that would impede its management by the Court as a class action.

e.     Defendants have acted on grounds generally applicable to class members, making class-wide relief appropriate.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**Violation of RICO, 18 U.S.C. §§ 1962(c)**
**(On Behalf of All Plaintiffs and the RICO Class)**
**(Class Claims against All Defendants)**

249.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

250.    Each Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

251.    The Enterprise, consisting of each named Defendant and the unnamed officers, executives, and other employees of BlueChip and ZestFinance, are in fact an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through the online lender Spotloan.

252.    The Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

253.    Defendants violated § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

254.     RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

255.     All of the loans made to the RICO Class members and collected by Defendants included an interest rate far in excess of twice the enforceable rate their states.

256.     Plaintiffs and the RICO Class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

257.     This conduct began sometime in 2012, continues to date, and will be repeated again and again in the future, to the detriment of consumers in Virginia, Florida, Georgia, Illinois, Maryland, New Jersey, North Carolina, and Texas and other states with similar usury laws.

258.     Accordingly, Defendants are jointly and severally liable to Plaintiffs and the RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## SECOND CAUSE OF ACTION

**Violation of RICO, 18 U.S.C. §§ 1962 (d)**
**(On Behalf of All Plaintiffs and the RICO Class)**
**(Class Claims against All Defendants)**

259.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

260.     Each Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

261.     The Enterprise, consisting of each named Defendant and the unnamed officers, executives, and other employees of BlueChip and ZestFinance, are in fact an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting off of the

collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through the online lender Spotloan.

262. The Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

263. Defendants violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt. Each Defendant knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

264. This conduct began sometime in 2012, continues to date, and will be repeated again and again in the future, to the detriment of consumers in Virginia, Florida, Georgia, Illinois, Maryland, New Jersey, North Carolina, and Texas and other states with similar usury laws.

265. Accordingly, Defendants are jointly and severally liable to Plaintiffs and the RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### THIRD CAUSE OF ACTION

#### Violation of Virginia Usury Laws

266. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

267. Under Virginia law, the maximum allowable interest rate on a consumer loan is 12% per annum. Va. Code § 6.2-303.

268. All of the Spotloan loans made to Virginia consumers had an annual interest rate well in excess of 12%.

269.     None of the Defendants had a consumer finance license permitting them to make loans charging interest in excess of 12% APR when they made the loans to the Virginia Plaintiffs, nor did they ever attempted to obtain such a license.

270.     As a result of their failure to obtain a license (as well as charging interest in excess of 36%), Defendants' loans are null and void under the laws of Virginia. Va. Code § 6.2-1541(A).

271.     Accordingly, Defendants' loans are null and void, and it was unlawful for Defendants or any of their affiliated entities to collect or receive any principal, interest, or charges on the loans, including the amounts paid by Plaintiffs. Va. Code § 6.2-1541(A).

272.     Additionally, the Virginia Plaintiffs and the Class are entitled to recover all amounts paid on these void loans, as well as twice the amount of usurious interest repaid. Va. Code §§ 6.2-1541(B), 6.2-305.

## FOURTH CAUSE OF ACTION

### Violations of Texas Usury Law

273.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

274.     Under Texas law, "[a] greater rate of interest than 10 percent a year is usurious unless otherwise provided by law." Tex. Fin. Code § 302.001(b).

275.     A person who makes consumer loans and charges interest at a rate higher than 10% is required to hold a license. Tex. Fin. Code §§ 342.005, .051.

276.     All of the loans made to the Texas Plaintiffs and the Texas Class members were well in excess of the 10% maximum rate allowed under Texas law.

277.     At no time were Defendants licensed to make consumer loans or to collect or receive payments on consumer loans in the state of Texas.

278.     Defendants' conduct was not the result of an accidental and bona fide error but instead was a deliberate, willful, and intentional scheme to circumvent Texas law, and to collect interest at rates well in excess of that allowed by the law.

279.     Accordingly, the Texas Plaintiffs and Class members are entitled to the greater of (1) three times the interest charged in excess of 10%, or (2) the lesser of $2,000 or 20% of the principal. Tex. Fin. Code § 305.001.

280.     Additionally, because Defendants charged the Texas Plaintiffs and the Class members interest at a rate twice the amount authorized by Texas law, the Texas Plaintiffs and the Class members are also entitled to recover the principal amount of the loan, interest, and any other charges or fees. Tex. Fin. Code § 305.002.

281.     Alternatively, even if Defendants could take advantage of the higher interest rates permitted under Tex. Fin. Code § 342, *et seq.*, Defendants charged the Texas Plaintiffs and the Class members interest in excess of the amount authorized by that law.

282.     Accordingly, the Texas Plaintiffs and the Class members are entitled to twice the amount of interest Defendants charged or received, plus reasonable attorneys' fees. Tex. Fin. Code § 349.001(a). Additionally, because Defendants charged the Texas Plaintiffs and the Class members interest at a rate twice the amount authorized by Texas law, the Texas Plaintiffs and the Class members are entitled to the principal balance in addition to interest. Tex. Fin. Code § 349.002.

## FIFTH CAUSE OF ACTION

### Violations of Florida Usury Law

283.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

284.     All of the loans made by Defendants to Florida consumers used an interest rate greater than eighteen percent (18%).

285.     Fla. Stat. § 516.02(c) provides that "[a] loan for which a greater rate of interest or charge than is allowed by this chapter has been contracted for or received, wherever made, is not enforceable in this state." Defendants' loan agreements violated Fla. Stat. § 516.02 because they contained interest rates greater than 18%.

286.     Defendants' loan agreements violated the criminal usury provisions of Fla. Stat. § 687.071 because they contained interest rates greater than twenty five percent (25%). Such loans are "therefore void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

287.     Plaintiff Sherman and Class members are entitled to disgorgement of twice the amount of such usurious interest that was paid. Fla. Stat. § 687.04

## SIXTH CAUSE OF ACTION

### Violations of Georgia Usury Law

288.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

289.     In their loans to Georgia consumers, Defendants charged and collected interest at a rate greater than the maximum legal rate of interest under Georgia law. Ga. Code Ann. §§ 16-17-1, et seq; Ga. Code Ann. §§ 7-3-1, et seq.

290.     Defendants made loans to Georgia consumers even though they are not licensed to make loans in the State of Georgia.

291.     Under Georgia law, the loans are void and unenforceable.

292.    The Georgia Plaintiffs and the Class are entitled to recovery of all principal and interest paid to the Defendants under the terms of the illegal loans and award damages equal to three times the amount of any interest paid by the borrowers arising out Defendants' loan transactions. The Georgia Plaintiffs and the Class are entitled to further seek the recovery of attorneys' fees and costs.

## SEVENTH CAUSE OF ACTION

### Violations of Georgia RICO

293.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

294.    Under Georgia's RICO statute, it is "unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." Ga. Code Ann. § 16–14–4(a).

295.    Violations of Georgia's Payday Lending Act, Ga. Code Ann. §§ 16-17- 1, *et seq* are predicate acts and racketeering activity. Defendants have engaged in a pattern of racketeering activity by their violation of Georgia's Payday Lending Act.

296.    Conspiracy and/or endeavoring to violate the substantive provisions of Georgia's RICO Act is a separate violation of the statute. Ga. Code Ann. § 16-14–4(c).

297.    For the same reasons set forth in Plaintiffs' federal RICO causes of action, Defendants constitute an "enterprise" under Georgia's RICO law.

298.    Through their conduct, Defendants have violated and/or conspired to violate Georgia's RICO law.

299.    The Georgia Plaintiffs and the Class are entitled to appropriate injunctive relief, treble damages, punitive damages, attorneys' fees and costs. Ga. Code. Ann. § 16-14-6.

**EIGHTH CAUSE OF ACTION**

**Violations of Illinois Consumer Installment Loan Act – 205 Ill. Comp. Stat. 670/1, et seq.**

300.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

301.     Under the Illinois Consumer Installment Loan Act, a "'[s]mall consumer loan'" means a loan upon which interest is charged at an annual percentage rate exceeding 36% and with an amount financed of $4,000 or less. 205 ILCS 670/15.

302.     Small consumer loan lenders are required to be licensed to make loans. 205 ILCS 670/1.

303.     If an unlicensed lender makes a small consumer loan to an Illinois consumer, "the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan." 205 ILCS 670/20(d).

304.     Defendants violated Illinois law by charging interest rates making small consumer loans without a license and charging interest rates far in excess of those permitted to licensed

305.     As a result of these unlawful loans, Plaintiff Hunter and the Class are entitled to recover damages, attorneys' fees, and costs pursuant to 205 ILCS 670/20(b); 205 ILCS 670/20.7.

**NINTH CAUSE OF ACTION**
**Violation of Illinois Consumer Fraud Act – 815 ILCS 505/2**

306.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

307.     Defendants, in the course of trade or commerce, engaged in unfair acts and practices, in violation of 815 ILCS 505/2, by contracting for and collecting finance charges, interest, and fees, from Illinois residents, in excess of the amounts permitted by Illinois law.

308.     These unlawful charges caused actual damages to Plaintiff Hunter and the Class.

309.    Pursuant to 815 ILCS 505/10a, Plaintiff Hunter and the Class seek damages for all amount paid to the Defendants, injunctive relief, and attorneys' fees and costs.

## TENTH CAUSE OF ACTION

### Violations of Maryland Consumer Loan Law

310.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

311.    Maryland's Consumer Loan Law limits the annual interest rate on Defendants' loans as follows:

> (i) For any loan with an original principal balance of $2,000 or less, 2.75 percent interest per month on that part of the unpaid principal balance not more than $1,000 and 2 percent interest per month on that part of the unpaid principal balance that is more than $1,000;
>
> (ii) For any loan with an original principal balance of more than $2,000, the maximum rate of interest is 2 percent per month on the unpaid principal balance of the loan

Md. Code, Com. Law § 12-306(a)(6).[5]

312.    Moreover, if an unlicensed lender makes a loan for less than $6,000 and charges interest in excess of Maryland's interest rate limitations, such loans are void and unenforceable, and the lender or any third-party may not collect, obtain, or receive any principal, interest, or charges whatsoever on said loans. Md. Code, Com. Law § 12-314.

313.    As set forth more fully above, in the course of making and collecting on loans to Plaintiff Showell and other consumers in Maryland, Defendants repeatedly and knowingly charged, demanded, and accepted interest far in excess of Maryland's interest-rate caps.

---

[5] Additionally, "[i]f any principal balance remains unpaid 6 months after the loan matures as originally scheduled or deferred, the lender may not contract for, charge, or receive interest at a rate exceeding 6 percent simple interest per annum on the actual unpaid principal balances from time to time." Md. Code, Com. Law § 12-306.

314.    Accordingly, it was unlawful for Defendants to collect or receive any principal, interest, or charges on the loans, including all amounts paid by Plaintiff Showell and Class members.

315.    Because Defendants' violations were willful, Plaintiff Showell and the Class are entitled to recover from Defendants any principal, interest, or other charges with respect to the loans. Md. Code, Com. Law § 12-313(b)(1). Alternatively, Plaintiff Showell and the Class may recover three times any excess amount paid. Md. Code, Com. Law § 12-313(b)(2).

## ELEVENTH CAUSE OF ACTION
### Violation of New Jersey Usury Laws

316.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

317.    The maximum interest rate chargeable to consumers under New Jersey law is 16%. N.J. Stat. § 31:1-1(a).

318.    All of the loans made to Plaintiff Grandy and the Class were in excess of the maximum rates allowed under New Jersey law.

319.    Defendants' conduct in doing so was knowing, deliberate, intentional, and willful. Defendants' purpose was to take more than the legal rate of interest for the money loaned to Plaintiff Grandy and members of the Class.

320.    Under N.J. Stat. § 31:1-4, Plaintiff Grandy and members of the Class are entitled to a declaration that their loans are unlawful and usurious, and restitution of all amounts paid to Defendants in excess of the principal amount, plus the costs of bringing this action.

## TWELFTH CAUSE OF ACTION
### Violation of New Jersey Consumer Finance Leasing Act

321.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

322.    Defendants are or were "consumer lenders" as that term is defined by the Consumer Finance Leasing Act ("CFLA"). N.J. Stat. § 17:11C-2.

323.    Defendants are or were engaged in the "consumer loan business" as that term is defined by the CFLA. N.J. Stat. § 17:11C-2.

324.    All of the loans made to Plaintiff Grandy and the Class were in excess of the maximum rates allowed under New Jersey law.

325.    Defendants' loans to Plaintiff Grandy and members of the Class were "consumer loans" as that term is defined by the CFLA. N.J. Stat. § 17:11C-2.

326.    The CFLA requires that consumer lenders must be licensed in the State of New Jersey. N.J. Stat. § 17:11C-3. The CFLA also provides that anyone engaged in business as a consumer lender who is not licensed is "guilty of a crime of the fourth degree." N.J. Stat. § 17:11C-33(b). The act further provides that loans made by unlicensed lenders "shall be void and the lender shall have no right to collect or receive any principal, interest or charges unless the act was the result of a good faith error…." *Id.* In addition, the CFLA provides that "a consumer lender who knowingly and willfully violates any provision of this act shall also forfeit to the borrower three times any amount of the interest, costs or other charges collected in excess of that authorized by law." *Id.*

327.    At no time were Defendants licensed to make consumer loans or to collect or receive payments on consumer loans in the State of New Jersey. As a result, the conduct at issue herein is not merely unlawful; it is criminal.

328.    Defendants' conduct was not the result of a good faith error but instead was a deliberate, willful, and intentional scheme to circumvent New Jersey law and to collect interest at rates well in excess of that allowed under the law. Plaintiff Grandy and members of the Class are entitled to a declaration that such loans are void.

329.    In addition, Defendants have no right to any principal, interest, or charges on the loans, and Plaintiff Grandy and members of the Class are entitled to restitution of all amounts paid to Defendants, plus forfeiture of three times of the amounts of interest, costs, or other charges collected by Defendants in excess of that authorized by law.

**THIRTEENTH CAUSE OF ACTION**
**Violations of New Jersey Consumer Fraud Act**
**(On behalf of Plaintiff Grandy and the New Jersey Class)**
**(Class Claims against All Defendants)**

330.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

331.    The New Jersey Consumer Fraud Act ("CFA") prohibits, among other things, the "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression or omission of any material fact … in connection with the sale or advertisement of any merchandise." N.J. Stat. § 56:8-2. The requirements of the CFA extend to the offering, sale, or provision of consumer credit.

332.    Defendants' unlawful, criminal consumer lending practices constitute "unconscionable commercial practices" within the meaning of the CFA.

333.    Defendants' conduct caused an ascertainable loss to Plaintiff Grandy and members of the New Jersey Class by, among other things, forcing Plaintiff Grandy and members of the Class to pay excessive, unlawful, unconscionable, and usurious rates of interest on consumer loans.

## FOURTEENTH CAUSE OF ACTION
### Violation of Washington Usury Law - RCW 19.52.030

334.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

335.    Under RCW 19.52.020, the maximum allowable interest rate in Washington has been twelve percent per annum since at least 2004. See also RCW 19.52.025; State Maximum Interest Rate, available at  http://leg.wa.gov/CodeReviser/Documents/rates.htm.

336.    A contract is usurious if it provides for a rate of interest higher than the statutory maximum of twelve percent. RCW 19.52.030(1).

337.    If a contract is usurious, "the creditor shall only be entitled to the principal, less the amount of interest accruing thereon at the rate contracted for; and if interest shall have been paid, the creditor shall only be entitled to the principal less twice the amount of the interest paid, and less the amount of all accrued and unpaid interest; and the debtor shall be entitled to costs and reasonable attorneys' fees plus the amount by which the amount the debtor has paid under the contract exceeds the amount to which the creditor is entitled." RCW 19.52.030(1).

338.    Defendants entered into usurious contracts with Plaintiffs Panas and Johnson and Washington Class members by charging interest rates well in excess of twelve percent.

339.    Therefore, Plaintiffs Panas and Johnson and Class members are entitled to a declaration that Defendants' loan contracts are usurious. Plaintiffs Panas and Johnson and Class members are entitled to recover any amounts paid in excess of the amount Defendants are entitled to collect on the loans, pursuant to RCW 19.52.030.

## FIFTEENTH CAUSE OF ACTION

### *Per se* Violation of the Washington Consumer Protection Act – RCW 19.86.020 and RCW 19.52.036

340.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

341.     Plaintiffs Panas and Johnson and Class members are "persons" within the meaning of the Washington Consumer Protection Act, RCW 19.86.010(1).

342.     Pursuant to RCW 19.52.036, "[e]ntering into or transacting a usurious contract" is per se "an unfair act or practice in the conduct of commerce for purposes of application of the consumer protection act."

343.     As alleged above, Defendants entered into usurious contracts with Plaintiffs Panas and Johnson and Class members by contracting for interest rates exceeding the statutory maximum of twelve percent. Thus, Defendants engaged in unfair acts or practices in the conduct of commerce.

344.     Defendants' unfair and deceptive acts or practices have impacted the public interest because they have injured Plaintiffs Panas and Johnson and thousands of Washington residents by charging them interest in excess of the amount allowed by law.

345.     Defendants' unfair acts and practices therefore affect the public interest.

346.     As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiffs Panas and Johnson and Class members have been injured. Defendants' conduct has injured the property of Plaintiffs Panas and Johnson and other Class members by charging and collecting interest that they were not legally entitled to charge or collect.

347.     Defendants' wrongdoing is continuing in nature and represents an ongoing threat to Plaintiffs Panas and Johnson and Class members, particularly since Defendants continue to

make loans to Washington residents at usurious interest rates and continue to collect unlawful interest on usurious loans already made to Washington residents. Thus, Plaintiffs Panas and Johnson and Class members will suffer continuing, immediate, and irreparable injury absent the issuance of injunctive and equitable relief.

348.    Plaintiffs Panas and Johnson and Class members are entitled to recover actual damages, treble damages, and injunctive and equitable relief. In addition, Plaintiffs Panas and Johnson and Class members are entitled to recover attorneys' fees and costs pursuant to RCW 19.86.090.

**SIXTEENTH CAUSE OF ACTION**
**Violation of the Washington Consumer Protection Act – RCW 19.86 – Deceptive Business Practices**

349.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

350.    Plaintiffs Panas and Johnson and Class members are "persons" within the meaning of the Washington Consumer Protection Act, RCW 19.86.010(1).

351.    Defendants engaged in deceptive acts that occurred in trade or commerce by conduct set forth above. These deceptive acts include the following:

      a.    Attempting to avoid application of Washington usury law by improperly using tribal sovereign immunity as a shield for their activities;

      b.    Representing or implying that state law does not apply to Plaintiffs Panas' and Johnson's and Washington Class members' loans;

      c.    Charging interest rates that are well in excess of the rates allowed by law and demanding or collecting payment of this excessive interest.

352.    Defendants' deceptive acts and practices have occurred in trade or commerce.

353. Defendants' deceptive acts or practices have impacted the public interest because they have injured Plaintiffs Panas and Johnson and thousands of Washington residents by charging them interest in excess of the amount allowed by law. Defendants deceived Plaintiffs Panas and Johnson and members of the Class by representing or implying that they could legally charge interest rates of 400% or more because Defendants claim BlueChip Financial is a tribal entity not subject to state law.

354. As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiffs Panas and Johnson and Class members have been injured. Defendants' conduct has injured the property of Plaintiffs Panas and Johnson and the other Class members by charging and collecting interest that they were not legally entitled to charge or collect.

355. Defendants' wrongdoing is continuing in nature and represents an ongoing threat to Plaintiffs Panas and Johnson and Class members, particularly since Defendants continue to represent that they are lawfully entitled to make loans exceeding Washington's usury cap, continue to make loans to Washington residents at usurious interest rates, and continue to collect unlawful interest on usurious loans already made to Washington residents. Thus, Plaintiffs Panas and Johnson and Class members will suffer continuing, immediate, and irreparable injury absent the issuance of injunctive and equitable relief.

356. Plaintiffs Panas and Johnson and Class members are entitled to recover actual damages, treble damages, and injunctive and equitable relief. In addition, Plaintiffs Panas and Johnson and Class members are entitled to recover attorneys' fees and costs pursuant to RCW 19.86.090.

## SEVENTEENTH CAUSE OF ACTION
### Violation of the Washington Consumer Protection Act – RCW 19.86 – Unfair Business Practices

357.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

358.     Plaintiffs Panas and Johnson and Class members are "persons" within the meaning of the Washington Consumer Protection Act, RCW 19.86.010(1).

359.     Defendants engaged in unfair acts that occurred in trade or commerce by conduct set forth above. These deceptive acts include the following:

a.     Attempting to avoid application of Washington usury law by improperly using tribal sovereign immunity as a shield for their activities;

b.     Representing or implying that state law does not apply to Plaintiffs Panas and Johnson and Washington Class members' loans;

c.     Charging interest rates that are well in excess of the rates allowed by law and demanding or collecting payment of this excessive interest.

360.     Defendants' acts and practices are unfair because they: (1) cause substantial financial injury to Plaintiffs Panas and Johnson and members of the Washington Class; (2) are not outweighed by any countervailing benefits to consumers or competitors; and (3) are not reasonably avoidable by consumers. Defendants' acts and practices are also unfair because they are immoral, unethical, oppressive and unscrupulous.

361.     Defendants' unfair acts and practices have occurred in trade or commerce.

362.     Defendants' unfair acts or practices have impacted the public interest because they have injured Plaintiffs Panas and Johnson and thousands of Washington residents by charging them interest in excess of the amount allowed by law. Defendants acted unfairly by representing

or implying that they could legally charge interest rates of 400% or more because Defendants claim BlueChip Financial is a tribal entity not subject to state law.

363.    As a direct and proximate result of Defendants' unfair acts and practices, Plaintiffs Panas and Johnson and Class members have been injured. Defendants' conduct has injured the property of Plaintiffs Panas and Johnson and the other class members by charging and collecting interest that they were not legally entitled to charge or collect.

364.    Defendants' wrongdoing is continuing in nature and represents an ongoing threat to Plaintiffs Panas and Johnson and Class members, particularly since Defendants continue to represent that they are lawfully entitled to make loans exceeding Washington's usury cap, continue to make loans to Washington residents at usurious interest rates, and continue to collect unlawful interest on usurious loans already made to Washington residents. Thus, Plaintiffs Panas and Johnson and Class members will suffer continuing, immediate, and irreparable injury absent the issuance of injunctive and equitable relief.

365.    Plaintiffs Panas and Johnson and Class members are entitled to recover actual damages, treble damages, and injunctive and equitable relief. In addition, Plaintiffs Panas and Johnson and Class members are entitled to recover attorneys' fees and costs pursuant to RCW 19.86.090.

366.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

## EIGHTEENTH CAUSE OF ACTION
### Violation of California Usury Laws

367.    Under the California Constitution, the maximum allowable interest rate on a consumer loan is 10% per annum. Cal. Const. Art. XV § 1.

368. All of the loans made to California consumers in the name of Big Picture and Red Rock used an annual interest rate well in excess of 10%.

369. Accordingly, Plaintiffs Bulette, Taitai, and Burns and Class members are entitled to recover all interest paid on the loans in excess of 10%, plus treble damages for any interest paid within the year preceding the filing of this action and their attorney's fees and costs. Cal. Civ. Code § 1916-3.

## NINETEENTH CAUSE OF ACTION
### Violations of Cal. Bus. & Prof. Code § 17200

370. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

371. As alleged above, Defendants engaged in unlawful, unfair, and deceptive business practices through the sham relationship with the Tribes in order to make high-interest loans to consumers throughout the country, including California.

372. Defendants' conduct violated California's unfair competition laws, Cal. Bus. & Prof. Code § 17200, et seq., which prohibits unlawful, unfair, or deceptive business practices. Cal. Bus. & Prof. Code § 17200.

373. Accordingly, Plaintiffs Bulette, Taitai, and Burns and Class members are entitled to recover all interest paid on the loans in excess of 10%, as well as an injunction prohibiting any future collection of the loans. Cal. Bus. & Prof. Code § 17203.

## TWENTIETH CAUSE OF ACTION
### Violation of Connecticut Usury and Licensing Laws

374. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

375.     Under Connecticut law, the maximum allowable interest rate on a consumer loan is 36% per annum. Conn. Gen. Stat. Ann. § 36a-558(d)(1).

376.     All of the Spotloan loans made to Connecticut borrowers had an annual interest rate well in excess of 36%.

377.     In order to charge 36% per annum, a person must obtain a small loan license from the Commissioner of Connecticut's Department of Banking. Conn. Gen. Stat. Ann. § 36a-556(a)(1)-(2), (4).

378.     If a person fails to obtain a license prior to making a small loan or makes a licensed small loan in excess of 36% APR, "[s]uch small loan shall be void and no person shall have the right to collect or receive any principal, interest, charge or other consideration thereon." Conn. Gen. Stat. Ann. § 36a-558(d)(1).

379.     Defendants were never licensed to make consumer loans in Connecticut, rendering each of the loans made to Plaintiffs Biehl and Gross and Class members void.

380.     Additionally, even if they were licensed, Defendants' loans far exceed the 36% cap provided in Conn. Gen. Stat. Ann. § 36a-558(d)(1).

381.     Accordingly, Defendants' loans are null and void, and it was unlawful for Defendants or any of their affiliated entities to collect or receive any principal, interest, or charges on the loans, including the amounts paid by Plaintiffs Biehl and Gross and Class members. Conn. Gen. Stat. Ann. § 36a-558(d)(1).

## TWENTY-FIRST CAUSE OF ACTION
### Unjust Enrichment

382.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

383.    Plaintiffs and class members conferred a benefit on Defendants when they made payments on loans that were void or made payments of interest beyond the amounts legally collectible under state law.

384.    To the detriment of Plaintiffs and class members, Defendants have been, and continue to be, unjustly enriched as a result of charging and collecting illegal, usurious interest rates from Class members.

385.    As between the parties, it would be unjust for Defendants to retain the benefits attained by their actions. Accordingly, Plaintiffs seek a full accounting and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful conduct alleged herein.

## TWENTY-SECOND CAUSE OF ACTION
### CIVIL CONSPIRACY

386.    All of the loans to consumers in the name of Defendants violated Plaintiffs' respective state's interest rates and lending laws.

387.    Defendants conspired amongst themselves to violate state usury and lending laws and profit from those violations.

388.    Accordingly, on behalf of themselves and all other consumers similarly situated, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans with Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.    An Order certifying the proposed Class under Fed. R. Civ. P. 23(b)(2) and (b)(3), and appointing Plaintiffs as Class Representatives and their counsel as Class Counsel;

B.     An Order declaring that Defendants are financially responsible for notifying members of the Class of the pendency of this suit;

C.     An Order declaring that Defendants have committed the violations of law alleged herein;

D.     An Order providing for any and all injunctive relief the Court deems appropriate;

E.     An Order awarding monetary damages, including, but not limited to, any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

F.     An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

G.     An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

H.     An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees; and

I.     Such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. P. 38(b).

RESPECTFULLY SUBMITTED AND DATED this 10th day of February, 2020.

CONSUMER LITIGATION ASSOCIATES, P.C.

By: /s/ Leonard A. Bennett, VSB #37523
    Leonard A. Bennett, VSB #37523
    Email: lenbennett@clalegal.com
    Craig C. Marchiando, VSB #89736
    Email: craig@clalegal.com
    763 J. Clyde Morris Boulevard, Suite 1-A
    Newport News, Virginia 23601
    Telephone: (757) 930-3660
    Facsimile: (757) 930-3662

    Kristi C. Kelly, VSB #72791
    Email: kkelly@kellyguzzo.com
    Andrew J. Guzzo, VSB #82170
    Email: aguzzo@kellyguzzo.com
    Casey S. Nash, VSB #84261
    Email: casey@kellyandcrandall.com
    KELLY GUZZO, PLC
    3925 Chain Bridge Road, Suite 202
    Fairfax, Virginia 22030
    Telephone: (703) 424-7572
    Facsimile: (703) 591-0167

    E. Michelle Drake
    Email: emdrake@bm.net
    John G. Albanese
    Email: jalbanese@bm.net
    BERGER & MONTAGUE, P.C.
    43 SE Main Street, Suite 505
    Minneapolis, Minnesota 55414
    Telephone: (612) 594-5999
    Facsimile: (612) 584-4470

    Beth E. Terrell
    Email: bterrell@terrellmarshall.com
    Jennifer Rust Murray
    Email:  jmurray@terrellmarshall.com
    Elizabeth A. Adams
    Email: eadams@terrellmarshall.com
    TERRELL MARSHALL LAW GROUP PLLC
    936 North 34th Street, Suite 300
    Seattle, Washington 98103
    Telephone: (206) 816-6603

Facsimile: (206) 319-5450

Matthew Wessler
Email: matt@guptawessler.com
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
Telephone: (202) 888-1741
Facsimile: (202) 888-7792

*Attorneys for Plaintiffs and Proposed Class*